Case number 24-3887, 25-3017, USA v. Anita Green, and 24-3899, USA v. Amanda Hovanec. Oral argument, 10 minutes for each defendant, 20 minutes for the plaintiff. Ms. Copeland for the appellant. Good morning. May it please the Court, my name is Amy Lee Copeland. I represent Anita Green on her acceptance of responsibility and her restitution appeals. I've reserved two minutes for rebuttal in this case. In this case, the district court denied my client a reduction for acceptance of responsibility based on two factors. Number one, her pre-indictment statements to investigating authorities. And number two, statements that she made at her change of plea hearing. This was erroneous. On appeal, the government also tosses in that this was a supportable decision because of objections that my client's trial counsel made to the PSR. I want to discuss each of these. Number one, when you carefully read the transcript, and I have parsed or recited the relevant pages of the transcript at pages 16 to 20 of the brief, what the client is really talking about when she talks about knowingly is the controlled substance. She did not know that etorphine, or M99, was used until after the fact. At the time, she believed it was poison. This is consonant with what her daughter said to authorities. It's in the PSR, my client's PSR, that Amanda had always said it was poison. The cooperating co-defendant, Mr. Theodoro, also talks about the terms poison being used in the lead-up to the murder of my client's former son-in-law. The transcript is clear when you read it. This is what she's talking about. I did not know that it was a controlled substance, that it was M99, until after the fact. The second basis is the fact that all of the statements that the government relied on occurred in my client's pre-indictment interviews. Trial counsel doesn't raise this as an objection to the court's consideration of those statements at the sentencing hearing. His grounds for, trial counsel's grounds for supporting acceptance of responsibility were how my client acted. She accepted responsibility early. She pled guilty. She is genuinely remorseful. He also attacked Mr. Theodoro's credibility, but he doesn't say. There's a rich vein of Sixth Circuit case law that says at the very earliest, indictment is the time to look at acceptance of responsibility, and that's Jeter. He doesn't talk about Tilford or Hackley or Rogers, which then says it's the time of the guilty plea. But this was plain error. There was error that was plain that affected my client's substantial rights. She received a substantially longer sentence. I want to talk about, too, the government's argument here that trial counsel made objections to the PSR, to the duress and coercion. Trial counsel believed my client should have gotten a downward departure for that and believes that the client should have received a minimal role reduction. The government argues that her own counsel's objections to the PSR are enough to deny her acceptance of responsibility. I've cited in my brief the Mukes case, so there have to be specific findings. It's not simply enough to object and lose to a PSR recommendation. The judge has to make specific findings that this was done to try to falsely deny or frivolously contest. I also want to point out, last night I decided to reread the 400 pages of pre-indictment statements, those transcripts. My client's factual basis for those statements in the PSR appeared to come from statements that Ms. Green made through the pre-indictment interviews, specifically page ID number 1483-86 and 1492-97. Ms. Green does talk about being awakened and she's addled and she doesn't know what's going to happen and then she drives. So none of these are bases for denying the acceptance of responsibility reduction to my client. Turning next to restitution, which was under the Victim Witness Protection Act, the statute divides it into three classes of victims, victims that suffer property damage, victims that suffer bodily injury, and any case where there's a victim. The government admitted at sentencing that Green's offense, which was accessory after the fact, didn't cause her ex-son-in-law's death, that is, that there was no bodily injury. That is the reason the government sought restitution only for counseling expenses for the minor children. The government at page ID 1521 says that my client's action caused only psychological harm to these minor victims. The government said that? At page ID number 1521, and that was in the government's sentencing memorandum shortly before the sentencing hearing. So when you look at the string of cases that talk about whether psychological harm is sufficient, cases that have decided on preserved error review have said that you have to have bodily injury. That's a physical harm. The statute does not define bodily injury. But Patton and the Sixth Circuit refused to reward lost wage reimbursements to a wife who cared for her husband who had been shot by someone. You look at Wilcox. Isn't that a completely different kind of situation than what's involved here, though? This is not a lost wages case, admittedly, but the section that Patton looked at was one of the bodily injury cases. Like I said, the statute categorizes it in three different types of injuries to victims. So whereas this was a subsection A case, I think Patton dealt with a subsection C case, but under the same bodily injury rubric. I'm sorry to ask this clarification. Is this the Mandatory Victims Act or the Victim and Witness Protection Act? Which provision is involved here? It's Victim Witness Protection Act. The district court, in its restitution order, talks about it as an MBRA case, as does defense counsel, but it is not one of the mandatory statutes that require reimbursement and restitution to victims. So it's a VWPA case. It's sort of odd to me that your client would be objecting to pay restitution when it is for the psychological care of her own grandchildren. Your Honor, this is a terrible case, and as a mother, I very much agree with you that my client pursued this objection in trial court, nonetheless that she did, and putting aside our feelings in this case, the statute doesn't provide for just bodily injury restitution. My client also had reached a settlement agreement. Of all the folks sued for the injury caused by the harm, my client is the only one who paid anything to the victim. She reached a $500,000 settlement agreement. Was she the only one who had any money? Your Honor, that I do not know. I'm not privy to Ms. Hovindak's or Mr. Theodore's PSIs, but she did sell family property. I believe she liquidated her thrift savings plan because she was a longtime federal employee, and she did pay $500,000. That was one of the claims trial counsel pursued, that awarding the minor victims any restitution would be double counting. I haven't pursued that claim on appeal. The settlement agreement accepts any restitution awarded in the criminal case. But, Your Honor, the weight of the authority and preserved error between the Sixth, the Eighth, the Ninth, and the Fourth Circuits say that bodily injury is required. So I know there's some argument that your client, by providing the material to decompose the body of the son-in-law, caused physical injury, and then therefore there's an opportunity to have psychological benefits paid to the grandchildren. Is that an argument that you contest also? That wasn't a bodily injury, though, to the minor victims. You're saying it has to be to the minor victim in order for the minor victim to be able to get psychological counseling. It does, Your Honor. We don't contest that the minors are victims in this case. That would be a sucker's argument. But there was no bodily injury to the minors themselves. Thank you.  Good morning, Your Honor. May it please the Court. My name is Ben Morell, and I represent Defendant Appellant Amanda Hovanek. 18 U.S.C. Section 3553A makes clear that a district court must consider the history and characteristics of a criminal defendant before determining and then imposing a federal sentence. Sometimes, in fact, all too often, this includes evidence of a history of childhood abuse, neglect, and trauma, as well as mental health disorders like post-traumatic stress disorder that often result from those experiences. The Supreme Court has repeatedly stressed in cases like Wiggins v. Smith and Williams v. Taylor that this type of evidence can have a powerful mitigating effect. It is, therefore, critical for courts to consider at sentencing. The district court here committed clear error during the sentencing of Ms. Hovanek by mischaracterizing the most important mitigating evidence in the record, and it did so in two ways. First, the court adopted the government's mischaracterization of the psychological evaluation report as containing only unsubstantiated statements coming from the defendant herself, where, in fact, they were corroborated by two other witnesses. Second, the court inaccurately stated that Dr. Brahms was a, quote, hired advocate and improperly dismissed her report as a work of advocacy rather than objectivity. These clear errors of fact combine to result in a both procedural and substantively unreasonable sentence. Let me just ask you if those arguments about Dr. Brahms rise to the level of serious consideration when it was claimed, and you could tell me if this is not right, that Dr. Brahms did not do any testing and did not look at medical records. Those kinds of things would tend to undermine that report of Dr. Brahms. Your Honor, I think that goes to weight. Now, the government certainly did criticize the psychological evaluation report by asserting that it was too casual or that it didn't have certain reviews of certain medical records. But that, I think, is a different consideration than what the district court did here, which was in order to properly weigh that evidence and assess that kind of credibility determination, the district court first has to recognize the evidence for what it is. And these errors are more about differences in kind rather than degree. If the district court is saying that something is uncorroborated when it is, in fact, corroborated by two witnesses and is then a work of advocacy as opposed to objectivity, that's like a step before we get to the weighing of the evidence. It was corroborated by two witnesses, you say. Were those the two of the multiple sisters? Yes, Your Honor. Samantha Green and Jill Barber, two of Ms. Hovannik's older sisters. Wouldn't you have a stronger argument with regard to Dr. Brahms if your client had asked the court to appoint an independent expert to perform this evaluation instead of hiring their own person in the personal of Dr. Brahm and simply using someone who had been found or selected by one party here? Well, Your Honor, that certainly was an option that could have happened, but what the defense did here was to hire a medical expert to examine Ms. Hovannik and to provide conclusions. And Dr. Brahms' report specifically states that she was hired not to provide any specific opinion in this case, but she was paid for her time, and to issue her report regardless of what it may say. And so we have not only general statements of law in the cases cited in our brief from the D.C. Circuit, from the Ninth Circuit, saying that medical professionals are not to be seen as advocates. Their work is something different. It is fundamentally different. But we also have the report itself saying that it is not a work of advocacy. It's, in fact, a work of objectivity. One of the things the district court found troubling was the fact that there was not any kind of psychological testing or other testing by Dr. Brahm. Is that correct? Was it all interviews simply with Ms. Hovannik? Your Honor, it was interviews, and it was also a review of certain other previous documents. And in the field of psychiatry and psychology, interviews are very important tools necessary to make determinations and to reach diagnoses. I think the strongest piece of medical testimony in that report is that Ms. Hovannik clearly meets the categories under the DSM for post-traumatic stress disorder. That I don't think the government even meaningfully contests. Some of the interviews were done over the telephone. The sisters were interviewed that way, and Dr. Brahm didn't go to the measure of doing in-person interviews on all the witnesses. So there are multiple weaknesses in her fact-gathering process, wouldn't you say? Your Honor, it's certainly not the most ideal thing that could have happened. Dr. Brahms was limited by funds provided and also by time. But she interviewed Ms. Hovannik in person, and that's the most important interview to have is for those to be in person. Now, her statements and her interviews with the sisters, Ms. Green and Ms. Barber, were conducted over the telephone. But what's important there to note is that despite the fact that they were over the phone, which is a fine method of communication for many purposes, those sisters corroborated the story, and that's what the district court got wrong. They corroborated not only specific instances of childhood abuse and neglect. I need not go into the details here. They're all in the brief. But they also talked about their own mental health struggles following those experiences, which also serves to corroborate Ms. Hovannik's mental problems, not only her PTSD, but also the other instances of cognitive struggles that she has had. So when it comes to corroboration, I think the telephone interviews were sufficient, and the district court getting wrong the corroboration part is pretty objective. Now, there are cases that we cite in our brief. There's Miller v. Dretke from the Fifth Circuit, McMullen v. Dalton from the Seventh Circuit. Those cases highlight that there is a very, very different way to look at evidence that's corroborated versus only a criminal defendant, because when only the criminal defendant is interviewed and those statements aren't corroborated, they can oftentimes be correctly seen as self-serving, and that's how the district court looked at that evidence here as self-serving, and that's what the government argued in this case. But what the district court missed and what the government mischaracterized in sentencing and the district court adopted was that this wasn't just a self-serving statement from a criminal defendant. This was two sisters who grew up with Ms. Hovannik, with personal knowledge who were there, who intimately discussed with Dr. Brahms these specific experiences they had and the trials and tribulations with their own mental health they've been going through ever since. Did the two sisters appear at the sentencing? No, Your Honor. So all of their information comes through Dr. Brahms? Yes, Your Honor. So there was no other way for the district court to have considered this. I believe, now that I think about it, Your Honor, I believe Ms. Green was interviewed by the probation officer and that was included in the pre-sentence report, but that is much less detail than was provided. And Green, I assume, denied that there was an abusive home? No, Your Honor. Ms. Green was one of the, oh, I'm sorry, Samantha, Samantha Bahr. You're not talking about the mother here. Yes, Your Honor. I'm talking about Samantha, one of the sisters. So one of the sisters was interviewed by the probation officer and provided a small amount of corroboration. But what's important is that the level of detail and the level of corroboration that went in Dr. Brahms' report makes that by far the most important mitigating evidence in the record. And do I understand correctly that Samantha was in the room when they were discussing the murder and the judge sort of dismissed her for that reason? So the district court didn't make that finding, but yes, Your Honor, in the record, Samantha, I'm going to use first names here, Samantha Green was in the room when Ms. Hovanek made a statement to her mother, Anita Green, I'm going to kill him. It's unclear whether she was present for anything else. Just that statement alone doesn't necessarily mean that someone's going to do it. But that was in the record. There's no evidence that this court considered that and dismissed Samantha's account for that reason. And besides that, Jill Barber, the other sister, also fully corroborated this. So even if there was some credibility determination to be made about Samantha, simply because she was there for that conversation, I don't think that that helps the other sister who wasn't, who also corroborated that. Didn't the boyfriend say that the three of them, the mother, daughter, and the boyfriend, had dinner together a few days before the murder, which they discussed what they were going to do? Isn't that in the record of the proceedings? Yes, Your Honor. That's Anita Green and then my client and then Mr. Teodoro, the boyfriend. The three of them had a discussion over dinner about where to bury the body and things like that. But there's no evidence that Samantha, the sister, was privy to any of those specific conversations. So essentially, and your red light is on now, but your entire argument here is that the district judge mischaracterized this Dr. Brown's report, should have given it more weight, and therefore the sentence should be overturned and the case should be sent back for resentencing. Yes, Your Honor, with one qualification. So it's not a weight issue because I think that would go to substantive reasonableness. This is a procedural reasonableness issue because of clear errors of fact that basically before this court could make that determination and properly weigh the evidence, these errors of fact led to mischaracterizing them, and therefore that's clear error for procedural grounds. And that was brought to the attention of the district judge so the district judge could correct it? Your Honor, it's our position that these issues were presented to the district court. I know the government argues plain error, if I may, for a minute. Yes. Our argument is that the sentencing memorandum that Ms. Hovannik submitted discussed this report and these things specifically, the corroboration issue, and then also the role of Dr. Brahms in this case. Defense counsel also argued at the sentencing hearing and raised the report. The government has a different opinion of the plain error standard in thinking it's much more granular. I don't think that's right, and the government doesn't provide any case law to support its contention that plain error applies without that level of granularity. Did the district judge ask the so-called Bostic question? Yes, Your Honor. And the defense counsel for your client did not ask for further explanation, is that correct? That's correct, Your Honor. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Laura Ford on behalf of the United States. I'd like to begin this morning with Greene's restitution argument, and then I'll move to the other ones. The district court in this case correctly ordered Greene to pay restitution for her grandchildren's psychological care. They were direct victims in their own right under the Victim Witness Protection Act, Section 3663A2, because Greene's offense specifically targeted them, because her main role in this accessory after-the-fact offense was to help Hovenak to prevent her apprehension for causing the death of the children's father. This crime occurred in broad daylight right after their father dropped them off, and it was Greene's role to distract these children actively while Hovenak was preparing the body for disposal. But where is the bodily injury? The bodily injury is, well, our position is that this falls under 3663B2A. The bodily injury is a broad term that includes both psychological and physical harm. So reading this, B2 says, in the case of an offense resulting in bodily injury to a victim, pay, then under A, for psychological care. But doesn't that require under B2, in the case of an offense resulting in bodily injury, where is the bodily injury to the child? The bodily injury first comes through, it can come in two different ways. It can come through physical injury, or it can come through psychological harm. It's our position that we have both here. Okay, so where's the physical injury to the children? The physical injury is tied to the psychological injury. They go hand-in-hand, that the psychological trauma is so severe that there is a physical impact, which the victim's mother, the children's paternal grandmother, talked about that there has been physical impact in this case. And in the victim impact statement at 1725, she describes the children having headaches, abdominal pain, worsened asthma, food allergies. She's a nurse, and she said that this has resulted in having physical manifestations. So your theory, and I'd be curious if there are cases that support it, are that if the victims, these grandchildren, or children as they are, had such significant psychological harm that their bodies reacted subsequently, that that would constitute the bodily injury under B-2 of 3663? Yes, if bodily injury is read narrowly to mean physical injury, it's our position that bodily injury is this umbrella term that encompasses both physical or mental harm, and that we have both here. Okay, what source supports your position that bodily injury is an umbrella term for physical and or psychological? The Brescher's case from the Seventh Circuit, it's 684 Fed 3rd 699, pages 702 to 703. And also the Dotson case, which is 2000 Westlaw 182037, asterisk 5, it's a Westlaw case. It's a Tenth Circuit 2000 case. Both of those cases looked at it and found that this is a holistic term, that it broadly encompasses both physical and psychological aspects. And the Brescher's specifically looked at also other statutes that have bodily injury in the criminal code that do define bodily injury to include psychological injury. And I think if Congress wanted to restrict it and wanted to say that this was physical harm, it could have done that. But it didn't do that here. And I think the words that follow... Wouldn't you just reasonably say that if it wanted to include it, would it have included it the way it did in the other statutes? Well, it could have done that. But I think that the words that follow, that including the psychological harm, serve the same purpose as the functional equivalent of a definition that would include those broad terms. And in those two cases, was there any physical injury to go with the psychological injury? That was not looked at. And there's only one case that I found that described physical injuries. Not physical injuries, but that is the Harwood case, which is a District of New Mexico 2012 case. And that case was a situation where it was a third party that was assuming the victim's status. That's not what the basis for restitution in this case. We're arguing that the victims were directly victims in this case. But that was the victim's sister. The crime was basically a drunk driving offense that occurred on a Native American reservation. And curiously, the defendant in that case said, hypothetically, if the victim's children had been requesting grief counseling, there would be no objection to that under B2A. But there the sister was saying, well, when I had visitation, I felt chills through my body and reported dizziness. And there the government did not argue that those injuries were compensable under B2A. And then there was also a question about whether the Navajo healing ceremony would have qualified for medical treatment. So those were two problems with that case. And arguably, it would have been wrongly decided under the Tenth Circuit Dotson decision that I've cited. So that was the only case that found that where you had these physical symptoms that were also present, the cases that are direct victim cases like Powell and Hicks, those cases did not include any type of physical manifestations from psychological injuries. And that's why our case, I think, is unique. But certainly it's our position that the term bodily injury is broad, and it does include either injury. Here we have both. And isn't it sort of strange that 3663B2, in its beginning language, talks about resulting in bodily injury to a victim, and then under A says pay an amount equal to the cost of necessary medical and related professional services relating to physical, psychiatric, and psychological care. So in that particular subsection of 2, they're mentioning physical and psychiatric and psychological, whereas in the beginning part it just says bodily injury. So does that not show that Congress was using specific words to mean specific things? I think that when they bring those three terms, that serves a definitional purpose, even though it certainly would have been an easier case if the Congress had expressly defined it, but I don't think they need to because they're telling courts exactly what they meant by that. And I think the other problem with a lot of the cases that Green is citing is that they intermingle a different paragraph for lost income that have definite article language that restrict it to the victim and such victim. And we don't have that in B2A, and I think that's telling. And Green recently filed a 28J letter, I think it was last Thursday, that talked about the NVRA being amended, that lost income paragraph, where they've essentially said, okay, no, if you have a victim who's assuming the victim's status, it's a family member, they can recover lost income. Essentially, they've fixed that problem of the definite article language. They didn't do it for B2A under the NVRA, which is substantially identical under the Victim Witness Protection Act. And I think that's telling because there isn't a restriction to a particular victim in B2A. Whereas C uses reimburse the victim, and then 4B4 says reimburse the victim. So you're saying the absence of the word the is significant in B2A? Correct, Your Honor. And the cases like, for instance, the Patton decision is an NVRA decision from this court. It's a 2016 case where this court said that family couldn't recover for lost wages without suffering bodily injury. It would have been based on that definite article language, the victim. And that's just not present here. There isn't that restriction under B2A. And here, this crime, this concealment, would have been very difficult to have achieved without Green's involvement in this case. Because it's broad daylight. The time has changed. It's in April. When this occurs, the girls are awake. Their father drops them off. And she needs Green to be able to prepare the body, to roll it into the garage, to put it in plastic, put the victim's body, to use the zip ties. I don't understand where that's going. I thought we were talking about this restitution. It's to her role in this and why her involvement caused the victim's harm in this case. Because she certainly could have mitigated some of it. These children were living with her at the time. She could have prevented that harm by not participating in these concealment efforts. And they are very aware that she was involved in that because they spoke with her paternal grandmother and said that Green was waiting outside for them, that she had toys and she snatched them inside. And because she was involved, they've essentially lost half of their family. And that's what the victim's mother, the girl's paternal grandmother, spoke about at page ID 3456. They went from living with their mother and their grandmother. They went to a museum a few days later. Their dad's car was gone. Suddenly, shortly after that, authorities are interviewing their grandmother, their mother. Suddenly, they can't live with their mother. They can't live with their grandmother. This is incredibly traumatic to lose half of your family. And she certainly, if she hadn't been participating in this and aiding Hovenak, she would not have added to their harm in this case. And they've suffered tremendously because of that, both mentally and physically. And the court properly found that restitution was proper in this case for those reasons. If we need to find that there was physical injury, is it enough that there's someone who says that the girl's psychological problems caused physical injury? Is that enough? I believe it is, yes, Your Honor, because this court can affirm on any ground that the 2010 Henderson case says that. And I would say I disagree with my colleague that the government said it was psychological harm only. The government may have only discussed psychological harm, but it didn't say it was limited to that and did reference the victim's impact statements at page ID 1519, which would encompass the description about the physical injury in this case, and that would be sufficient to affirm that. Turning to the acceptance of responsibility, the district court's denial in this case was not only rare, it was the first time it could ever recall denying acceptance of responsibility, and that was not clearly erroneous because Green was parsing relevant conduct from her guilty plea clear until throughout sentencing. What about her argument that she didn't know that this was a controlled substance? She just thought it was poison, and therefore she wasn't denying responsibility. She was saying what she thought was the situation. I mean, that's certainly one view, but I think you have to look at the totality of the circumstances and what she was doing. She was misrepresenting her involvement from the outset. When you turn to her sentencing and also the PSR objections where she's saying, you know, I didn't know anything until I was awoken by this. I was completely unaware. I couldn't really process anything. That's contradicted by the evidence in this case, by looking, by listening to Theodoro's testimony, by looking at the video, the fact that she provided a decomposition substance, and she can't lay the blame on her attorney because she espoused the exact same view. She confirmed that she'd read the pre-sentence report, that she submitted changes that were made at page ID 3267, and then she herself says that when she was awakened with a demanding insistence from her daughter, I drove the vehicle with the victim's body instead of refusing and dialing 911 at page ID 3433. So I think looking at this, the totality of the circumstances when she's minimizing, well, I didn't know what substance it was. She has been minimizing her conduct from the outset, from her plea, or whether you want to look at it from the PSR or at sentencing. She has frivolously contested relevant facts and utterly failed to show that she met the qualification for acceptance of responsibility. She showed a complete lack of remorse. And I think this type of crime that she committed with the accessory after the fact, that's a crime of dishonesty. It involves concealment. And she's never been honest about the full scope of her involvement in this case, which actually began much earlier than what she indicated. The court watched the video and said it was left with the inescapable conclusion based on this sequencing. It was seamless, that she knew exactly what was going to happen. This is a tough video, but I would encourage the court, if the court hasn't seen it, to watch it, because there's a moment when these children arrive home, and Hovanec's focus isn't immediately on her children. She looks back at her mother kind of like it's a conspiratorial look. Are you ready? And it's certainly not a clearly erroneous finding to conclude from that that she was involved in this much earlier. You can consider that as relevant conduct, that she was involved earlier than this, or you can look at it as accessory after the fact that she starts her involvement the minute the victim dies. How does all of that show that she's not accepting responsibility once she is caught? It shows that she's not accepting responsibility because she's indicating, I knew nothing about this until they woke me up to help drive them to the location. So that's the lie. That's the lie, because she actually drove them to pre-dig the grave. She knew about this. I mean, you don't even have to consider the fact that she saw the syringe ahead of time, but she's minimizing her conduct and knowing that she was part of these murder discussions, that she was involved much earlier, and she had an opportunity. She says, oh, okay, well, you know, I was awoken and I didn't call 911. She had an opportunity to call 911 a lot earlier than this. So hypothetically, what is a defendant to do when their crime that they've been accused of and committed and convicted of is accessory after the fact, and then there are questions that are being raised that show involvement before the fact? I think 2X3.1, which is the guideline, the sentencing guideline, is instructive because it points to 1B1.1 in Note 10, and it defines relevant conduct as being all conduct known or reasonably should have been known. And so then you look at, okay, what did Greene know when she was agreeing, when she decided to become involved as an accessory after the fact? And that's the piece that she's just not being honest about when she's characterizing it as just being woken up, and that's when I became involved. So what, I mean, I'm somewhat talking hypothetically, but what she should have done then is to have refused to answer questions about what did you know beforehand because that would incriminate her to more than just being an accessory after the fact. I think she has to be honest about what her involvement was. But wouldn't that incriminate her to something more than being an accessory after the fact? Well, I mean, she, yes. You can't require somebody to incriminate themselves, can you, in order to get acceptance of responsibility? She needs to be, she can't frivolously contest her involvement. And when she's saying that the first I knew about this was being woken up, and that's just not the case. The evidence refuted that, and so that was frivolously contesting the facts. And that's why she didn't qualify for the reduction in this case. Briefly, as to Hovenak's arguments. I don't know that you really answered the question. I mean, it would be better, I think, if you really engaged with it. What does someone in that position do? I mean, they're not charged as a principal. So it's kind of irrelevant what she knew before the event. I think the guidelines suggest that it is relevant what you knew when you started, when you embarked on this as being an accessory after the fact. But even if you take out what she knew beforehand, she's still not being honest about when her offense conduct began. She's representing that she wasn't involved until she drives them to dispose of the body when she instead was actively involved during the early cover-up when Hovenak is rolling the body into the garage and putting plastic around it. That's when her offense conduct, if you want to say, were locked into this accessory after the fact. She is involved at that point because she is actively distracting the girls with the toys. And that's the piece that she's not being honest about. She was helping at that point. What did she say was her reason for taking the girls inside? I don't think she ever addresses that. She does reference in one of her police reports or in one of the interviews, she talks about the Barbies laid out. But she represents that she was in shock and unable, even like in her pre-sentence report, objections that she wasn't able to process this. And she didn't know anything about this until she was awoken and they demanded that Hovenak demanded that she drive the girls or drive them to dispose of the body. So we focused on Green here, and I know your red light is on, but just briefly on Hovenak. Why didn't the district judge err in rejecting the doctors, Dr. Brahms's report such that we should remand for resentencing? Well, as Judge Clay noted, there were multiple weaknesses in the fact gathering in this process. This was termed a psychological evaluation, but the court said, in my experience, this does kind of seem more like a mitigation expert report because it didn't have the type of diagnostic testing for intellect and capacity that you would normally see with a psychological evaluation. It was simply accepting Hovenak's statements about past abuse and two out of the five sisters. And the court found it somewhat helpful. I mean, it said that, you know, there's something that happened. I don't doubt that. Something happened that caused you to get to this place. I'm not sure exactly what it is, but the sisters didn't completely corroborate this because you have their statement that the only way to stop the abuse was for the police to come out, but there was only one police report, and it involved a different sister. That sister was Holly. Just as, like, an add-on fact is, I mean, Holly talked at Green's sentencing, which happened later, but she didn't say anything about abuse, which is kind of curious. But this read more like a mitigation expert report in capital cases, and so the court accepted some of it and said, yeah, you know, there's no doubt that Hovenak has self-destructive tendencies at page ID 3512. It gave it a shaker of salt weight. I mean, the self-destructive tendencies was consistent with what the sisters said at page 7 of the report, that she had self-harm tendencies. But the court just ultimately disagreed that it just really wasn't that helpful because without that diagnostic testing, it didn't answer its questions. So the district court did not reject out of hand the report. The district judge gave some weight to the report.  Gave some weight, and to the extent that they want to characterize this as a procedural error, that was not preserved. There was a BOSTIC question, and they didn't object to saying, well, wait a minute, you didn't consider this. As to weight, then that would go to substantive reasonableness, and Hovenak has not demonstrated that the court abused its discretion in finding it somewhat helpful. And she got a downward variance, am I correct? Correct. A 480-month sentence, which is presumptively reasonable, and this was for a premeditation. Because the guideline sentence was life imprisonment? Yes, Your Honor. Okay. Unless this court has further questions, I see my light is on. We would ask that this court affirm the district court's judgments as to Green and Hovenak and also the restitution order. Thank you. Thank you, Your Honor. I believe the only statement my client made at sentencing was to read her acceptance of responsibility statement into the record. That statement had been sufficient for the government to get on board with the acceptance of responsibility of reduction prior to Teodoro's agreement to cooperate. She calls the situation horrific. I agree that it's true. The probation officer even observed in the sentencing recommendation at page ID 995 that every time Ms. Green talks to her supervising pretrial officer and during her pre-sentence interview, she's extremely remorseful. It's a common occurrence for her to cry and express regret. I want to talk next about what the government actually said and what the victim impact statement said about any sort of physical harm. Again, in its sentencing brief seeking restitution, the minor victims have suffered psychological harm. The government says this crime did not directly cause TH's death. It contributed to the minor's trauma and suffering. Turning to the victim impact statement that the government relies on at page ID 1725, this is what their grandmother writes. She is both an attorney and a nurse. During their 16 months with us, the girls suffered from various physical ailments, including abdominal pain, headaches, sleeplessness due to anxiety and nightmares, increased fear of snakes and spiders, especially poisonous ones, exacerbation of asthma, and development of food allergies and sensitivities. Some of these maladies were directly related to the stress of these horrific events and the loss of their parents, e.g., the sleeplessness and nightmares. Some may or may not be the direct result of these events, but the underlying and ongoing stress continues to have an immeasurable detrimental impact on Tim's daughters. Bodily injury means physical harm. Physical reactions, physical manifestations isn't harm to the body. My heart is elevated as I speak with you right now. That is a physical reaction. I do not contend that this oral argument is causing me bodily injury. Thank you. Thank you. Your Honor, the core issue of Ms. Hovannik's appeal is not a credibility determination of Dr. Brahms by the district court. Rather, it is an objective description of the mitigating evidence's nature, a description that is objectively wrong. This is a precondition to be able to accurately weigh this evidence. And because the district court couldn't do that, vacatur and remand is required to allow the district court to do it properly this time while seeing the evidence for what it is. If this court affirms, it will make a rule basically allowing district courts to dismiss experts as hired guns without engaging in actual analysis of their process, their methods, and their opinions. Now, if I could speak about plain error for just a minute. If this court finds plain error review does apply to this challenge, plain error review is satisfied here. This court need not look at each individual error but can combine the two because they both involve the same piece of evidence and similar ways of mischaracterizing it. Now, these errors combine to affect Ms. Hovannik's substantial rights. As Your Honor noted, this was a below-guideline sentence. The only guideline allowed here was life, so the district court was already willing to go below at least to some extent. And also, this court has found that where district courts base their sentences on a belief unsupported by the factual record, that prong of plain error is met as well. That's Hatcher. So, Your Honor, for these reasons, we submit that regardless of whether plain error review applies, reversal, vacate or remand, rather, should be granted. Thank you. Thank you both. On the defense side, I understand you're both appointed pursuant to the Criminal Justice Act, and we thank you for your service as Criminal Justice Act lawyers. We thank all sides for your argument. The cases will be submitted.